**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

COMPONENTONE, L.L.C.,       )
                               )
           Plaintiff,     )
                               )
          v.          )     02: 05cv1122
                               )
COMPONENTART, INC.,       )
STEVE G. ROLUFS, MILJAN      )
BRATICEVIC, DUSAN BRATICEVIC,   )
and CYBERAKT, INC.,        )
                               )
          Defendants.    )

## OPINION AND ORDER OF COURT

October 27, 2008

      Presently pending before the Court is the MOTION FOR SUMMARY JUDGMENT filed by Defendants (*Document No. 182*) with related filings and briefs in support and opposition, and Plaintiff's MOTION TO STRIKE DEFENDANTS' REFERENCES TO SURVEY EVIDENCE (*Document No. 191*) with briefs in support and opposition. After in depth consideration of the numerous and detailed filings of both parties, the relevant statutory and case law, and the record evidence, the Court will grant summary judgment in favor of defendants on all claims and deny plaintiff's motion to strike defendants' references to survey evidence.

## I. Background[1]

    This case arises from a trademark dispute between two firms that develop, sell, and

---

[1]The Court looks to the parties' Local Rule 56.1 statements to discern the facts and interprets them in the light most favorable to the non-movant.

provide support for users of reusable software tools designed to be integrated into larger software applications, generally known as "components," "tools" or "controls." Defs.' Rule 56.1 Statements 22; Pl.'s Rule 56.1 Counterstatements 11. Plaintiff ComponentOne L.L.C. ("ComponentOne"), is a Pennsylvania limited liability company with its principal place of business in Pittsburgh, Pennsylvania. Am. Compl. 1. ComponentOne's components are designed for use with Microsoft Windows. Pl.'s Rule 56.1 Counterstatements 8. Defendant ComponentArt, Inc., ("ComponentArt") is a Canadian corporation with its principal place of business in Toronto, Ontario, Canada. Am. Compl. 1. ComponentArt's components are designed for Microsoft Windows and web-based development. Defs.' Rule 56.1 Statements 1-11. ComponentArt also provides consulting services in conjunction with its products. *Id.* at 10. A number of ComponentOne and ComponentArt's products have overlapping functionality and the two firms consider themselves to be direct competitors. Pl.'s Rule 56.1 Counterstatements 12; Defs.' Resps. To Pl's Rule 56.1 Counterstatements 25.

### A. ComponentOne

ComponentOne was formed in July 2000 when two companies, VideoSoft, Inc.,[2] ("VideoSoft") and Apex Software Corporation ("Apex"), merged. Pl.'s Rule 56.1 Counterstatements 11. Prior to the merger, VideoSoft and Apex were "top sellers" of components. *Id.* at 2. The resulting firm chose the name "ComponentOne" because it suggested "one source for ComponentOne's products." *Id.* at 7.

ComponentOne offers its products individually and in bundles known as "suites" or

---

[2]Plaintiff refers to this entity as "VideoSoft, Inc." and "VS Corp." at various instances in its filings with this Court.

"studios." *Id.* at 8. ComponentOne was the first firm in the industry to also distribute its products through subscriptions. *Id.* at 9. In 2003 and 2004, Microsoft bundled a ComponentOne product in a package of "Visual Studio" products it sent to software developers. *Id.* at 11.

ComponentOne sells its products through its website, www.componentone.com, and through resellers such as ComponentSource. *Id.* at 10; Defs.' Rule 56.1 Statements 21. The prices of ComponentOne's products range from $500 - $1500, *id.* at 8, and the intended users of the products are persons who use Microsoft products to develop software. *Id.* at 12. ComponentOne's quarterly total sales averaged over $2,200,000 from the first quarter of 2004 to the second quarter of 2007, Gelchinsky Decl., Ex. BB, and its products have received numerous industry awards. Pl's Rule 56.1 Counterstatements 10; Moskal Decl., Ex. 19.

ComponentOne filed a trademark application with the United States Patent and Trademark Office ("PTO") for "COMPONENTONE[3]" on July 24, 2000. Pl's Rule 56.1 Counterstatements 8. The mark was registered without opposition on January 7, 2003. *Id.* ComponentOne has also registered the following marks with the PTO: "COMPONENTONE SMARTDESIGNER", "COMPONENTONE XMLHELP", "COMPONENTONE HELPCENTRAL", "COMPONENTONE NETHELP", "COMPONENTONE STUDIO", "COMPONENTONE NATURAL SEARCH", "COMPONENTONE RESPONSE", "COMPONENTONE RIBBON", "COMPONENTONE FRONTLINE", and "COMPONENTONE SILVERPOINT". *Id.* at 8-9. From the time ComponentOne was formed in July 2000 until May 2004, it has released and marketed more than forty products under the

---

[3]We will refer to the mark in the manner "the market pervasively uses" it, Pl.'s Mem. in Opp'n Summ. J. 35, "ComponentOne," for the remainder of the opinion. *See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 206 n.1 (3d Cir. 2000).

"ComponentOne" mark. *Id.* at 10. The mark has been presented in various stylized logo forms. *Id.* at 16; Defs.' Rule 56.1 Statements 7.

ComponentOne employs a number of methods to promote and market its products, including advertising in industry-specific publications,[4] participating in Google's search engine marketing program and attending trade shows.[5] Pl.'s Rule 56.1 Counterstatements 13, Defs.' Rule 56.1 Statements 31. Since its inception, ComponentOne has spent approximately $22,400,000 on these efforts. Pl.'s Rule 56.1 Counterstatements 10.

### B. ComponentArt

The firm now known as ComponentArt was founded by Miljan Braticevic in February 2000 under the name "Cyberakt Inc." ("Cyberakt"). Defs.' Rule 56.1 Statements 1. Cyberakt operated as a one-man software consultancy in its nascent stages. *Id.* In 2001, Cyberakt began developing components. *Id.*

Miljan Braticevic hired defendant Steve Rolufs to serve as the chief executive officer of Cyberakt in May 2002. *Id.* at 2. Defendants contend that Miljan Braticevic and Rolufs began discussing changing Cyberakt's name immediately after Rolufs was hired. *Id.* In the process of looking for a new name for Cyberakt, defendants researched competitors and potential competitors and their products. Pl.'s Rule 56.1 Counterstatements 3. This research included viewing ComponentOne's website. *Id.* During the name search, Rolufs conducted a search of internet domain names and discovered that "componentart.com" was available. Defs.' Rule 56.1

---

[4]Publications include Visual Studio Magazine, MSDN Magazine, asp.netPRO Magazine and SD Times. Pl.'s Rule 56.1 Counterstatements 13.

[5]Trade shows that ComponentOne has attended include VSLive, Microsoft TechEd, Microsoft PDC and ASP/DevConnections. Pl's Rule 56.1 Counterstatements 13.

Statements 3.  Cyberakt registered the "componentart.com" domain name on December 29, 2002, and, at some point on or before January 21, 2003, Cyberakt decided to change its name to "ComponentArt."[6]  *Id.*; Rolufs Decl. ¶ 11; Pl's Resp. to Defs.' Rule 56.1 Statements 7. According to defendants, one of the primary reasons that "ComponentArt" was chosen as the new name for Cyberakt was that it "signified the marriage of technology and creativity" because "Art" suggests creativity and uniqueness and "Component" identifies the company's core product.[7]  Defs.' Rule 56.1 Statements 4.

Cyberakt hired defendant Dusan Braticevic for the position of chief software architect in January 2003.  Defs.' Rule 56.1 Statements 3.  Over the course of 2003, Cyberakt worked towards developing a new brand identity, hoping to unveil its new name and website in 2004.  *Id.* at 5.  In order to accomplish this goal, Cyberakt hired an outside consultant to help it develop a new logo and corporate image.  *Id.*  During this process, Cyberakt had its outside counsel, Goodmans, conduct a "NUANS" search of Canadian corporate names.  *Id.*  The search revealed a number of firms with names that included the word "component," but not ComponentOne or any of its marks.  *Id.*  Goodmans also searched the United States trademark register and ascertained

---

[6]The parties dispute the date this decision was made.  Defendants claim that Miljan Braticevic, Rolufs and Dusan Braticevic decided to adopt ComponentArt as the new name on or around January 21, 2003.  Defs.' Rule 56.1 Statements 3; Rolufs Decl. ¶ 11.  ComponentOne, on the other hand, asserts that it reasonable to infer that the decision to change Cyberakt's name to ComponentArt occurred before Cyberakt registered "componentart.com" on December 29, 2002. Pl.'s Resp. to Defs.' Rule 56.1 Statements 7.  Resolution of this issue is not necessary for the purpose of the disposition of this case.

[7]Plaintiff disputes defendants' explanation for choosing "ComponentArt" as the new name for Cyberakt.  Instead, plaintiff appears to claim that the true reason that "ComponentArt" was chosen as the new name for Cyberakt was to trade off of the goodwill of ComponentOne. Pl.'s Resp. to Defs.' Rule 56.1 Counterstatements 7-8.

that the mark "ComponentArt" had not yet been registered.  *Id.*  Cyberakt did not, however,

utilize the services of a trademark search company during its inquiry into the availability of the

"ComponentArt" mark or obtain an opinion letter from its outside Canadian counsel regarding

the availability of the mark.  Pl.'s Rule 56.1 Counterstatements 5.  On February 18, 2004,

Cyberakt changed its corporate name to "ComponentArt."  Defs.' Rule 56.1 Statements 4.

ComponentArt publicly announced its name change and launched its new website at

"www.componentart.com" on May 14, 2004.  *Id.* at 6.

Like ComponentOne, ComponentArt offers its products both individually and in suites.

Gelchinsky Decl., Ex. B; Rolufs Decl. ¶¶ 34-35, 40-41, 45-47, 50-51, 55.  ComponentArt also

sells its products through its website and through resellers such as ComponentSource.  Defs.'

Rule 56.1 Counterstatements 24;

http://www.componentsource.com/products/componentart-webui/index.html (last visited

October 21, 2008).  Currently, the prices of ComponentArt's products range from $699 for an

individual "charting" component to $1,799 for the most expensive bundle of products, however,

at times relevant to this dispute some individual components were available at prices as low as

$99.  Defs.' Rule 56.1 Statements 24.  The intended users of ComponentArt's products are

computer programmers who develop software for the internet or Microsoft's Windows platform.

*Id.* at 1-11; Defs.' Mem. in Supp. Summ. J. 28.  ComponentArt and its products have received

numerous industry awards, with sales exceeding $6,700,000 CDN from January 2004 to January

2007.  Defs.' Rule 56.1 Statements 5-10, 31.

ComponentArt represents the "ComponentArt" mark as a trademark and has licensed the

mark to third parties even though it has not registered or attempted to register the mark with the

PTO. Pl.'s Rule 56.1 Counterstatements 6. When ComponentArt presents the mark in logo form, it uses either dark grey or black lettering or white lettering on a black or grey background in Futura font with a capitalized "C" and "A" and a small red dot as the bridge of the letter "A." Defs.' Rule 56.1 Statements 6. The logo is sometimes coupled with the tag lines "Helping You Build Something Amazing" or "Build Something Amazing." *Id.*

ComponentArt utilizes promotion and marketing methods similar to ComponentOne, including advertising in the same trade magazines, enrolling in Google's search engine marketing program and attending many of the same trade shows. *Id.* at 31-32. ComponentArt advertising expenditures from February 2004 to January 2007 totaled $1,300,000 CDN. *Id.* at 31.

### C. Procedural History

This dispute began in earnest with the Court's decision to grant ComponentOne leave to file a second amended complaint on October 12, 2006. ComponentOne filed its second amended complaint on the same day. The second amended complaint contains ten claims, specifically (I) unfair competition in violation of state common law, (II) use of a false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a), (III) trademark dilution in violation of the Lanham Act, 15 U.S.C. § 1125(c), (IV) unfair competition in violation of Pennsylvania law, 73 Pa.S. § 201-1, *et seq.*, (V) "common law" trademark infringement in violation of Pennsylvania law, 54 Pa.C.S. § 1101, *et seq.*, (VI) a prayer for injunctive relief, (VII) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114(1)(a), (VIII) unjust enrichment in violation of Pennsylvania common law, (IX) trademark dilution in violation of Pennsylvania law, 54 Pa.C.S. § 1124, and (X) civil conspiracy in violation of Pennsylvania common law. Am. Compl. 1-15. Defendants filed their answer to the amended complaint on January 3, 2007, in which they also

asserted several affirmative defenses.  Answer to Am. Compl. 1-8.

On August 21, 2007, defendants filed a motion for partial summary judgment on Counts III and IX of the second amended complaint.  The Court granted the defendants' motion in a Memorandum Opinion and Order dated December 7, 2007.  Judgment was entered in favor of defendants on Count III because the Trademark Dilution Revision Act of 2006 operates "to deny protection to marks that are famous only in 'niche' markets."  *ComponentOne, L.L.C. v. ComponentArt, Inc.*, No. 02:05cv1122, 2007 WL 4302108 at *2 (W.D. Pa. Dec. 6, 2007).  With respect to Count IX, the Court granted summary judgment in defendants' favor because Pennsylvania trademark dilution law is construed "in accordance with federal law."  *Id.* at *3.

Defendants now move for summary judgment on the remaining claims.  They contend that they are entitled to judgment in their favor on Counts I, II, V, VI, VII, VIII and X because ComponentOne cannot, as a matter of law, establish that their use of "ComponentArt" to identify their goods and services is likely to create confusion.  Defs.' Mot. for Summ. J. 1.  With respect to Count IV, defendants argue that ComponentOne does not have standing to assert a claim under 73 P.S. § 201-1, *et seq*.

## II. Summary Judgment Standard

Summary judgment is appropriate if, after examining the pleadings, discovery and disclosure materials on file, and any affidavits, the Court determines that there is no genuine issue and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56©.  Defendants, the moving parties, bear the initial burden of proving that no triable issue of material facts.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Since ComponentOne, the non-movant, bears the burden of proof, *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463,

470 n. 14 (3d Cir. 2005), it must then "make a showing sufficient to establish the existence of an element essential to its case." *Country Floors, Inc. v. Country Tiles*, 930 F.2d 1056, 1061 (3d Cir. 1991). To do this, the non-movant must go "beyond the pleadings and through affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (quoting *Celotex*, 477 U.S. at 324) (internal quotations marks and brackets omitted). In other words, the non-movant must "present affirmative proof that triable issues remain." *ICON Solutions, Inc. v. IKON Office Solutions, Inc.*, No. 97-4178, 1998 WL 314672, at *9 (E.D. Pa. June 16, 1998). Summary judgment will be granted only if "under the governing law no reasonable trier of fact could find in the [non-movant's] favor." *Id.*

At the summary judgment stage, the Court's function "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Primepoint, L.L.C. v. Primepay, Inc.*, 545 F.Supp.2d 426, 431 (D.N.J. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)); *see also E.T. Browne Drug Co. v. Cococare Prods., Inc.*, 538 F.3d 185, 196 (3d Cir. 2008) (the district court's role at the summary judgment stage is to evaluate the record to determine whether the plaintiff's claims can proceed to trial). Accordingly, the Court views all evidence in the light most favorable to the non-movant, accepts the non-movant's allegations as true, and credits all reasonable inferences that can be drawn from the underlying facts in the non-movant's favor. *See, e.g., Country Floors*, 930 F.2d at 1061. Nevertheless, the non-movant must demonstrate that there is more than a mere "scintilla of evidence" supporting its contention that a genuine, material issue of fact exists for trial. *Id.* at 1062. The non-movant cannot survive summary judgment solely on the basis of "largely

9

unsupported conclusions." *Freedom Card*, 432 F.3d at 481.

In applying the summary judgment standard in this case, the Court is cognizant of the Court of Appeals for the Third Circuit's observation that "summary judgment [is] the exception" in trademark actions." *Country Floors*, 930 F.2d at 1063. The Court will therefore strictly observe the principles governing summary judgment. *See id.* at 1062-63 ("[f]ailure to strictly observe the principles governing summary judgment becomes significant in a trademark . . . action").

## III. Discussion

### A. Trademark Infringement, Unfair Competition, False Designation of Origin

Defendants have moved for summary judgment, arguing that their use of the "ComponentArt" mark to identify their goods and services neither amounts to infringement of any of ComponentOne's trademarks under the Lanham Act, 15 U.S.C. § 1114(1),[8] and

---

[8]Section 1114(1) states:
Any person who shall, without the consent of the registrant–
  (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
  (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

10

Pennsylvania law, 54 Pa.C.S. § 1123(a),[9] nor constitutes unfair competition under Pennsylvania common law, nor operates as a false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).[10] Each of these claims requires ComponentOne to prove the same three elements, namely, (1) that its "ComponentOne" mark is valid and legally protectable, (2) that it owns the mark, and (3) defendants' use of its "ComponentArt" mark is likely to create confusion among consumers concerning its goods or services. *First Am. Mktg. Corp. v. Canella*, No. 03-cv-812, 2004 WL 250537, at *2 (E.D. Pa. Jan. 26, 2004). Defendants concede that ComponentOne satisfied the first two elements. Defs.' Mem. in Supp. Summ. J. 24. The only issue before the Court with respect to ComponentOne's trademark infringement, unfair competition and false

---

[9]Section 1123(a) states:
any person who shall:

(1) use, without the consent of the registrant, any reproduction, counterfeit, copy or colorable imitation of a mark registered under this chapter in connection with the sale, offering for sale or advertising of any goods or services in a manner likely to cause confusion or mistake or to deceive as to the source of origin of such goods or services; or

(2) reproduce, counterfeit, copy or colorably imitate any such mark and apply such reproduction, counterfeit, copy or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in connection with the sale or other distribution in this Commonwealth of such goods or services; shall be liable to a civil action by the registrant . . . .

[10]Section 1125(a)(1)(A) provides:
Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

designation of origin claims, therefore, is whether defendants' use of the "ComponentArt" mark for its goods and services "causes a likelihood of confusion." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 709 (3d Cir. 2004) (quoting *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000)).

A "[l]ikelihood of confusion exists when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service . . . identified by a similar mark." *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1229 (3d Cir. 1978); *A & H Sportswear*, 237 F.3d at 211. The Court of Appeals for the Third Circuit has developed a ten-factor test, commonly referred to as the "Lapp test,"[11] for evaluating whether this standard is satisfied. *See, e.g., A & H Sportswear*, 237 F.3d at 213-15. Originally designed for disputes in which the parties were not direct competitors, *see Versa Prods. Co. v. Bifold Co. (Mfg.)*, 50 F.3d 189, 202 (3d Cir. 1995), the Lapp test is now employed "to determine the likelihood of confusion in cases of directly competing goods, at least when the marks are not identical." *A & H Sportswear*, 237 F.3d at 214; *see also Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 281 n.8 (3d Cir. 2001) (Lapp test should be "applied in cases involving directly competing goods"); *Freedom Card*, 432 F.3d at 471 ("the *Lapp* factors should be used for both competing and non-competing goods").

The Lapp test is comprised of ten factors that are to be evaluated in determining whether a likelihood of confusion exists:

(1) the degree of similarity between the owner's mark and the alleged infringing

---

[11]The "Lapp test" derives its name from the case in which it was first enunciated, *Interpace Corp v. Lapp, Inc.*, 721 F.3d 460 (3d Cir. 1983). *See Freedom Card*, 432 F.3d at 471 n. 15.

mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers because of the similarity of function;

(10) other factors suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*Freedom Card*, 432 F.3d at 470-71 (quoting *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983)). The Lapp test is a qualitative, non-exhaustive inquiry. *Id.*; *see also A & H Sportswear*, 237 F.3d at 215. Its factors are "tools, not hurdles." *A & H Sportswear*, 237 F.3d at 214. "None of the[] factors is determinative . . . and each factor must be weighed and balanced." *Checkpoint Sys.*, 269 F.3d at 280; *see also Fisons Horticulture, Inc. v. Vigoro Indus.*, 30 F.3d

466, 476 n.11 (3d Cir. 1994) ("The weight given to each [Lapp] factor in the overall picture . . .

must be done on an individual fact-specific basis."). Nevertheless, in cases between direct

competitors, factor (1), the similarity of the marks, "takes on great prominence." *A & H*

*Sportswear*, 237 F.3d at 214. Factors (7), (9), and (10), on the other hand, are "not apposite" for

determining whether a likelihood of confusion exists in actions between direct competitors. *Id.* at

212.

In applying the Lapp test to address whether a likelihood of confusion exists in this case, the

Court is not required to evaluate the relevant factors in the sequence they were originally

enumerated. *Checkpoint Sys.*, 269 F.3d at 281 n.9. In order to ultimately demonstrate a

likelihood of confusion, ComponentOne must show more than a mere possibility of confusion,

but need not demonstrate actual confusion. *See Freedom Card*, 432 F.3d at 470 ("The relevant

inquiry is not whether consumer confusion is a possibility, but whether confusion is likely."); *see

also Fisons Horticulture*, 30 F.3d at 472 ("Proof of actual confusion is not necessary; likelihood

of confusion is all that need be shown.") (quoting *Ford Motor Co. v. Summit Motor Prods.*, 930

F.2d 277, 292 (3d Cir. 1991)). The determination of whether a likelihood of confusion exists is a

question of fact. *See Country Floors*, 930 F.2d at 1063. In order to survive summary judgment,

therefore, ComponentOne must show that a genuine issue of material fact remains as to whether

a likelihood of confusion exists in this case pursuant to the Lapp test.

In addition to "point of sale" confusion, the traditional form of confusion alleged in

trademark infringement actions,[12] ComponentOne alleges that defendants use of the

---

[12]*See* 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:5
(4th ed. 2007) ("The most common and widely recognized type of confusion that creates
infringement is purchaser confusion of source which occurs at the time of purchase: point of sale

"ComponentArt" mark has caused "initial interest confusion." Pl.'s Mem. in Opp'n Summ. J.

21. Initial interest confusion is "confusion that creates initial consumer interest [in the alleged

infringer's product], even though no actual sale is finally completed as a result of the confusion."

*McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 357 (3d Cir. 2007)

(quoting 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:6 (4th

ed. 2007) (hereinafter "McCarthy on Trademarks")). "Initial interest confusion is an

independently sufficient theory that may be used to prove likelihood of confusion." *Id.* at 358.

Since the Lapp factors are used to evaluate whether a likelihood of confusion exists as to "source

confusion" and "initial interest confusion," *id.*, the Court will address both forms of alleged

confusion, where appropriate, in its application of the test.

### 1. Similarity of the Marks (Lapp Factor (1))

The similarity of the parties' marks is "[t]he single most important factor in determining

likelihood of confusion." *A & H Sportswear*, 237 F.3d at 216; *Kos Pharms.*, 369 F.3d at 712-13;

*see also Checkpoint Sys.*, 269 F.3d at 281 ("when products directly compete, mark similarity may

be the most important of the ten factors in Lapp") (quoting *Fisons Horticulture*, 30 F.3d at 476)

(internal quotation mark omitted). The Court determines the similarity of the marks by

evaluating their "overall commercial impression." *See* 4 McCarthy on Trademarks § 23:22. The

overall commercial impression of the marks is analyzed by "mov[ing] into the mind of the roving

consumer," *A & H Sportswear*, 237 F.3d at 216; *Checkpoint Sys.*, 269 F.3d at 281, and

"compar[ing] the appearance, sound and meaning of the marks." *Checkpoint Sys.*, 269 F.3d at

281 (quoting *Harlem Wizards Entm't Basketball, Inc. v. NBA Props.*, 952 F. Supp. 1084, 1096

confusion.")

(D.N.J. 1997)).  In making this determination, the Court must give more weight to "the more forceful and distinctive aspects of a mark." *A & H Sportswear*, 237 F.3d at 216; *see also McNeil Nutritionals*, 511 F.3d at 359-60 ("forceful and distinctive design features should be weighed more heavily because they are more likely to impact the overall impression regardless of whether they happen to be similarities or differences") (internal citation omitted).  In order to find that the marks are confusingly similar, the allegedly infringing mark must be "substantially similar to the protectable mark." *Id.* (quoting *Versa Prods.*, 50 F.3d at 202).  Because the parties are direct competitors, however, "the degree of similarity required to prove a likelihood of confusion is less than in the case of dissimilar products." *Kos Pharms*. 369 F.3d at 713 (quoting 4 McCarthy on Trademarks at § 23:20.50).

The Court approaches its analysis of this factor knowing that "the determination as to the degree of similarity between two marks is highly fact sensitive and there is no decisive rule that is dispositive of any particular case." *EMSL Analytical, Inc. v. TestAmerica Analytical Testing*, No. 05-5259, 2006 WL 892718, at *6 (D.N.J. Apr. 4, 2006).  Defendants argue that this first Lapp factor militates conclusively in their favor because the common "component" portion of the two marks is a generic or descriptive term entitled to minimal weight in the Court's analysis. Defs.' Mem. in Supp. Summ. J. 25-27.  ComponentOne contends, conversely, that when the marks are viewed in their entirety, this Lapp factor weighs significantly in their favor.

A term within a trademark is generic when,

consumers think the term represents the generic name of the product or service or . . . indicat[es] merely one source of that product or service.  If the term refers to the product . . . the term is generic.  If, on the other hand, it refers to one source or producer of that product, the term is not generic.

16

*E.T. Browne*, 538 F.3d at 192 (quoting *Dranoff-Perlstein Assocs. v. Sklar*, 967 F.2d 852, 859 (3d Cir. 1992)) (internal punctuation omitted). Thus, a generic term "functions as the common descriptive name of a product class." *A & H Sportswear*, 237 F.3d at 222.

A genuine issue of material fact does not exist regarding the classification of the term "component" as the parties employ it in their marks. "Component" is the common term used to describe the reusable software designed to be integrated into larger software applications that the parties manufacture, sell, and provide support services for and is therefore generic. ComponentOne concedes as much when it states, "'component' . . . is among the terms available to reference the products sold." Pl.'s Mem. in Opp'n Summ. J. 5.[13]

If a portion of a mark is generic, "its presence . . . affect[s] the analysis of whether a competitor's mark containing the same [generic term] is likely to create confusion." *Dranoff-Perlstein Assocs.*, 967 F.2d at 861. When a court analyzes two marks that share a common generic portion under the first Lapp factor, "the emphasis of enquiry should be upon the confusing similarity of the non-generic portion, with the ultimate issue determined by the confusing similarity of the total impression of both marks." 4 McCarthy on Trademarks at § 23:49; *see also Am. Cyanamid Corp. v. Connaught Labs., Inc.*, 800 F.2d 306, 308 (2d Cir. 1986) ("Although . . . a [generic] component will not necessarily render the entire mark invalid, its

_____

[13]The Court notes that ComponentOne's "senior technology evangelist" John Juback confirmed the generic nature of the term "component" when he testified that the term has a generally understood meaning within the parties' industry as "a reusable piece of software." Gelchinsky Decl, Ex. M. The conclusion that the term "component" is generic is further bolstered when the Court considers that Dr. Sun Wong and Gustavo Eydelsteyn, ComponentOne's two "ultimate owners," Pl.'s Mem. in Opp'n Summ. J. 4, are "founding members of the Component Vendor Consortium, an organization supporting competitors who sell components." *Id.* at 5.

presence does affect the analysis of whether a competitor's mark containing the same component is likely to create confusion."). Thus, the Court will evaluate the similarity of the entire marks of the parties minimizing the effect of the common term "component."

Defendants' overstate the situation with respect to the similarity of the dominant portions of the parties' marks when they declare in their brief, "[t]here is simply no similarity between the suffixes 'one' and 'art.'" Defs.' Mem. in Supp. Summ. J. 27. The terms "one" and "art" are, however, obviously substantially dissimilar. Although both terms comprise three letters, they do not have a confusingly similar visual appearance. The three letters in "One" are rounded, creating a spacious term, while "Art" is a more narrow term formed with predominantly linear letters. When spoken, the terms "one" and "art" do not sound similar. "One" begins with soft "w" sound and ends with the relatively soft "n" while a hard "r" sound dominates "art." Turning to the terms' meaning, "one" can mean a number of things, but primarily evokes notions of singularity and primacy. The term "art" also carries a myriad of meanings. For example, "art" can be conceived of as a vacuous term (i.e., "postmodern art"), the Old English "is," or a shortened version of the name "Arthur." The Court finds that none of the potential reasonable definitions of the term "one" seriously overlap with reasonable definitions of the term "art."

Putting together its observations of the overall commercial impression of the non-generic portions of the respective marks, the Court finds that no genuine issue of material fact exists with respect to confusing similarity between "one" and "art." ComponentOne's managing director Gustavo Eydelsteyn admitted as much when he answered "no" in response to the question "Do you find the words 'art' and 'one' separately to be confusing or similar?" Gelchinsky Decl., Ex. EE.

The Court's analysis of the overall commercial impression of the parties' marks is not finished with its examination of the non-generic portions of the marks. "The proper legal is test is not whether there is some confusing similarity between sub-parts of the marks; the overarching question is whether the marks, viewed in their entirety, are confusingly similar." *Kos Pharms*. 369 F.3d at 713 (quoting *A & H Sportswear*, 237 F.3d at 216) (emphasis and internal quotation marks omitted). The parties have created a composite mark by placing the generic term "component" in front of the non-generic portion of their respective marks without using a space to separate the terms and employing the same convention of capitalizing the "c" in "component" and the first letter of the second non-generic term.

The common naming conventions tend to increase the similarity of the two marks, which tends to increase the potential for confusion. *See Primepoint*, 545 F. Supp. 2d at 436 (finding that the fact that "both marks are a single 'word' consisting of two 'words' spoken together" lends itself to confusion when evaluating the marks "Primepoint" and "PrimePay"). The Court cannot, however, give serious weight to any confusing effect that is caused due to the parties' use of the term "component" in the two marks. As the Court of Appeals for the Third Circuit has instructed, "that a particular feature is descriptive or generic . . . is one commonly accepted rationale for giving less weight to a portion of a mark." *Dranoff-Perlstein Assocs.*, 967 F.2d at 861 (quoting *In re Nat'l Data Corp.*, 753 F.2d 1056, 1058-59, 1060 (Fed. Cir. 1985)). If the common portions of the parties' marks were suggestive or arbitrary, a genuine issue of material fact would exist as to the confusing similarity of the marks. *See Country Floors*, 930 F.2d at 1063 (finding that the common use of the word "Country" in the marks of two competitor firms that manufactured ceramic tile was enough, by itself, to create a genuine issue of material fact for

trial on the issue of likelihood of confusion).  Here, however, the potential for confusion between the parties marks in the mind of consumers is manifestly decreased because of the generic nature of the term "component."  *See Am. Cyanamid*, 800 F.2d at 308 (a finding of trademark infringement cannot be based on the parties' common use of a generic term).

In sum, the first Lapp factor tips in favor of defendants because of the rank differences between the operative terms "one" and "art" and because the Court is to give only minimal weight to the parties common use of the term "component."  The "single most important factor" in the Court's likelihood of confusion analysis, *A & H Sportswear*, 237 F.3d at 216, weighs in favor of defendants and does not, by itself, create a genuine issue of material fact for trial.  The lack of a genuine issue of material fact as to the first Lapp factor may alone be enough to grant summary judgment to defendants on ComponentOne's trademark infringement, unfair competition and false designation of origin claims.  Nevertheless, the Court will examine the remaining Lapp factors, to the extent they are relevant, in order to get the fullest picture of the likelihood of confusion between the parties' marks.

## 2. Strength of the Marks (Lapp factor (2))

The second factor that courts in the Third Circuit evaluate under the Lapp test is the strength of the mark of the party claiming infringement.  *See Kos Pharms.*, 369 F.3d at 715.  To measure the strength of ComponentOne's mark, the Court evaluates "(1) the distinctiveness or conceptual strength of the mark; and (2) the commercial strength or marketplace recognition of the mark."  *A & H Sportswear*, 237 F.3d at 221 (quoting *A & H Sportswear Co. v. Victoria's Secret Stores, Inc.*, 57 F. Supp. 2d 155, 164 (E.D. Pa. 1999)); *Fisons Horticulture*, 30 F.3d at 479; *Checkpoint Sys.*, 269 F.3d at 282.

### a. Conceptual Strength

The inherent distinctiveness of a mark is the first measure of its conceptual strength. *Id.* at 222. A mark's inherent distinctiveness is measured by placing it within the spectrum of inherent distinctiveness, a continuum of four segments that identify the general measure of inherent distinctiveness of a mark. *See We Media Inc. v. Gen. Elec. Co.*, 218 F. Supp. 2d 463, 470 (S.D.N.Y. 2002) ("The level of protection accorded [a] mark depends on its degree of distinctiveness as measured on the classic, Lanham Act continuum."). The four segments, arranged from least to most inherently distinctive, are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary. *See, e.g., Dranoff-Perlstein Assocs.*, 967 F.2d at 855.

ComponentOne argues that its mark is "wonderfully suggestive." Pl.'s Mem. in Opp'n Summ. J. 2. A suggestive mark requires "consumer imagination, thought, or perception to determine what the product is." *A & H Sportswear*, 237 F.3d at 221-22 (quoting *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 297 (3d Cir. 1986)). ComponentOne believes that its mark is suggestive because, "[a]mong other things, 'ComponentOne' suggests 'one source for components' resulting from the merger of two highly-respected predecessors." Pl.'s Mem. in Opp'n Summ. J. 14. Defendants, on the other hand, assert that ComponentOne's mark falls into the descriptive segment of the spectrum. Defs.' Mem. in Supp. Summ. J. 46-48. A descriptive mark "describes the intended purpose, function, or use of the goods; of the size of the goods, of the class of the users goods, or of the end effect upon the user." *Checkpoint Sys.*, 269 F.3d at 282 (quoting *Ford Motor Co.*, 930 F.2d at 292 n.18).

In support of its contention that its mark is suggestive, ComponentOne cites an affidavit of its president, Dr. Sun Wong, in which he states that the firm chose the mark "ComponentOne"

to signify "one source for our products" after the merger of its predecessor firms VideoSoft and Apex. Moskal Decl., Ex. 15. ComponentOne argues that consumers must use imagination, thought or perception to see that a "ComponentOne" product is the fruit of the labor of the now united VideoSoft and Apex.

Dr. Wong's reasons for choosing the "ComponentOne" mark or the message he intended to communicate to consumers with that name, however, are largely irrelevant to the Court's analysis. In order to classify a mark within the spectrum of inherent distinctiveness "the Court does not look to the intent of the party choosing that mark. Instead, the impact of the mark on the minds of prospective consumers is controlling." *Rockland Mortgage Corp. v. Shareholders Funding, Inc.*, 835 F. Supp. 182, 189 (D. Del. 1993). The parties have not provided the Court with evidence of how consumers in their particular market interpret the meaning of the ComponentOne mark. Consequently, the Court is left with the task of attempting to step into the minds of consumers and determine the message.

Stepping into the mind of a consumer, the Court concludes that "ComponentOne" communicates messages of primacy, preeminence, or perhaps haughtiness to consumers. In joining the terms "component" and "one" in its mark, ComponentOne has created a mark that communicates notions of primacy or preeminence because the mark suggests that ComponentOne is the premier manufacturer of components. The mark communicates ideas of haughtiness because it implies that ComponentOne completely occupies the parties' market to the exclusion of all competitors. Since ComponentOne's mark communicates to consumers that the firm is the premier component manufacturer, it is obviously self-laudatory. The Court of Appeals for the Third Circuit instructs that "[s]elf-laudatory [portions of a] mark . . . are

generally held to be weak." *A & H Sportswear*, 237 F.3d at 222 (internal citations omitted); *see also* 2 McCarthy on Trademarks at § 11:17 ("Marks that are merely 'laudatory' and descriptive of the alleged merit of a product are also regarded as being 'descriptive.'"). As such, the Court finds that ComponentOne's mark falls into the weak, descriptive segment of the spectrum of inherent distinctiveness.

### b. Commercial Strength

A mark's commercial strength is the second factor evaluated in determining its overall strength. *Id.* at 221. To determine the commercial strength of "ComponentOne," the Court looks to "factual evidence of marketplace recognition," *id.* (quoting *Fisons Horticulture*, 30 F.3d at 479), "in the industry in which infringement is alleged." *Checkpoint Sys.*, 269 F.3d at 284. Evidence of funds expended on advertising and sales figures is relevant to this determination, but "does not automatically translate into consumer recognition." *A & H Sportswear*, 237 F.3d at 224.

Demonstrating that its mark is commercially strong is important to ComponentOne because the mark is inherently weak, falling in the descriptive segment of the spectrum of inherent distinctiveness. "The Lanham Act protects descriptive terms if they have acquired secondary meaning." *E.T. Browne*, 583 F.3d at 191; *Checkpoint Sys.*, 269 F.3d at 282-83. Secondary meaning exists if a mark "is interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products o[r] services." *Checkpoint Sys.*, 269 F.3d at 283 n.10. Descriptive marks that lack secondary meaning "are generally weak and not entitled to strong protection." *Id.* If ComponentOne demonstrates that its mark has attained secondary meaning, that finding will compensate for the

conceptual weakness of its mark in that it will also show that the mark has commercial strength under the second Lapp factor.

ComponentOne cites its advertising and sales figures as evidence that its mark has achieved secondary meaning in the parties' market. Since its inception, ComponentOne has spent almost $22,400,000 on marketing, advertising, promotional expenses, and shows and conferences. Moskal Decl., Ex. 21. Moreover, its quarterly sales averaged over $2,200,000 from the first quarter of 2004 until the second quarter of 2007. Moskal Decl., Ex. 22.

The evidence of ComponentOne's marketing expenditures and sales, while relevant for circumstantially establishing an association in the minds of consumers "between the mark and the provider of the services advertised under the mark," *id.*, does not, in the Court's view, demonstrate secondary meaning or commercial strength in and of itself. Although ComponentOne's efforts have "undoubtedly resulted in increased public recognition," *A & H Sportswear*, 237 F.3d at 224, the Court finds that the absence of any direct evidence of its mark's alleged secondary meaning is telling. While the evidence of advertising and sales figures conclusively demonstrates that ComponentOne "hoped the term would acquire secondary meaning, nothing shows that it achieved this goal. Jurors would have to make a leap of faith to conclude that the term gained secondary meaning because the record fails to provide sufficient support." *E.T. Browne*, 538 F.3d at 199; *see also Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1108 (6th Cir. 1991) (advertising budgets have only "an attenuated link to actual market recognition"); *EMSL Analytical*, 2006 WL 892718, at *7 (without a showing that advertising and marketing expenditures "created actual consumer recognition of Plaintiff's marks . . . the dollar amount of Plaintiff's advertising expenditures is

not necessarily probative of the strength of its marks.").

Due to the conspicuous lack of any direct evidence demonstrating consumer recognition of ComponentOne's mark in the parties' market, the Court finds that the mark does not enjoy the marketplace recognition required to find that it has secondary meaning, or commercial strength under the second Lapp factor. *See Primepoint*, 545 F. Supp. 2d at 438-39 ("merely setting forth the amount of money spent on advertising, while certainly relevant, does not suffice . . . to demonstrate a strong mark" without direct evidence of consumer recognition in the relevant marketplace). Since ComponentOne's mark is conceptually weak and ComponentOne has not provided sufficient evidence demonstrating commercial strength, the second Lapp factor weighs in defendants' favor.

### 3. Price of Goods and Care and Attention of Consumers (Lapp factor (3))

The Court now examines the third Lapp factor, "the price of goods and other factors indicative of the care and attention expected of consumers when making a purchase." *McNeil Nutritionals*, 511 F.3d at 363 (quoting *Lapp*, 721 F.2d at 463). The Third Circuit Court of Appeals has provided the Court with the following instructions on how to evaluate this factor:

> The following non-exhaustive considerations should guide a court's determination of ordinary care for a particular product. Inexpensive goods require consumers to exercise less care in their selection than expensive ones. The more important the use of a product, the more care that must be exercised in its selection. In addition, the degree of caution used depends on the relevant buying class. That is, some buyer classes, for example, professional buyers will be held to a higher standard of care than others. Where the buyer class consists of both professional buyers and consumers, the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer in the class.

*Id.* at 363-64 (quoting *Versa Prods.*, 50 F.3d at 204-05).

The parties agree that they target the same group of consumers, a group of Microsoft and web-based software developers. Defs.' Resps. To Pl's Rule 56.1 Counterstatements ¶ 64. They disagree, however, over the proper characterization of the class of the buyers of the products. Defendants argue that the buyer class for the parties products is composed of sophisticated, careful, deliberate purchasers. Defs.' Mem. in Supp. Summ. J. 27-29. ComponentOne, on the other hand, characterizes the class of buyers and potential buyers of the parties' products as a mix of sophisticated and unsophisticated purchasers. Pl.'s Mem. in Opp'n to Summ. J. 20-21.

As evidence of the care buyers exercise in purchasing the parties' products, defendants point first to the products' price. The cheapest product either party sold during the time relevant to this action were individual components which ComponentArt sold for $99. *See* Rolufs Decl. ¶ 63. The most expensive product manufactured and sold by either party, on the other hand, is a suite of components that ComponentArt sells for $1,799. *Id.* at ¶ 65.

Defendants have also presented the Court with testimony it elicited from ComponentOne's industry witnesses on the level of care that purchasers exhibit. Richard F. Williamson, chief executive officer of FarPoint Technologies, a firm Williamson describes as a "competitor of ComponentOne," Moskal Decl., Ex. 8, testified on purchasing habits of consumers in the parties' market. He stated that before purchasing a product, developers often download a free trial version of the product "and review it, make sure it fits their criteria." Gelchinsky Decl., Ex. O. Williamson also testified that many purchasers in the market research firms and products online using resellers such as ComponentSource and Google searches. *Id.* ("Most of our referrals are from Google."). When asked what factors "ultimately drive a decision to purchase a particular component over another," Williamson responded, "Functionality

usually." *Id.* Defendants also proffer the testimony of Kenneth L. Spencer, president of a "consulting software company" named FrameworkMasters, Moskal Decl., Ex. 11, that functionality drives purchasing decisions in the parties' market. *See* Gelchinsky Decl. Ex. P ("the real driving force [of a purchasing decision] is the feature set of the product. If the feature set of the product solves the problem, then that's going to drive them to buy the product."). Spencer also testified that a particular component manufacturer's support services are a "big factor" in the purchasing decision. *Id.*[14]

ComponentOne, on the other hand, characterizes the class of buyers and potential buyers of the parties' products as a mix of sophisticated and unsophisticated purchasers. Pl.'s Mem. in Opp'n Summ. J. 20-21. If ComponentOne were correct, the standard of care exercised by a reasonably prudent buyer for purposes of the third Lapp factor would be that of the least sophisticated buyer in the class. *See Checkpoint Sys.*, 269 F.3d at 285 ("If there is evidence that both average consumers and specialized commercial purchasers buy goods, there is a lower standard of care because of the lack of sophistication of some of the relevant purchasers."). To support its contention, ComponentOne relies solely on an affidavit of Dr. Wong. In the affidavit, Dr. Wong states, "Not all of ComponentOne's purchasers are sophisticated, professional buyers; rather, some purchasers do not possess an in-depth knowledge of the products they acquire."

---

[14]To further drive home its contention that purchasers of the parties' products make careful, deliberate decisions, defendants also submit the testimony of Rolufs that the purchase of a component, and particularly a suite of components, is a "longer-term investment[]" because "components create long-term code dependencies in customers' web applications." Rolufs Decl. ¶ 59-60. In support of this contention, Rolufs cites statistics from ComponentArt's website showing that an average of thirty-seven days elapse between the date a potential purchaser first creates a user account and the date the first product is purchased. The Court does not need to credit this self-serving testimony in order to reach its ultimate conclusion on the third Lapp factor.

Moskal Decl, Ex. 15.  Dr. Wong continues, "In my experience, the purchasing decisions are sometimes made quickly."  *Id.*

Viewing the facts in the light most favorable to ComponentOne, the Court finds that ComponentOne has failed to demonstrate an issue remains as to the characteristics of the relevant purchaser class.  The third Lapp factor favors defendants.  The parties' products are more expensive than other products that the Court of Appeals for the Third Circuit has found have sophisticated buyers.  In *A & H Sportswear*, the Court affirmed a district court's finding that purchasers of $50 to $70 women's swimwear were likely to be sophisticated.  237 F.3d at 225.  In *McNeil Nutritionals*, the Court upheld a district court's conclusion that purchasers "exercise some heightened care and attention" when buying $4 to $5 boxes of artificial sweeteners.  511 F.3d at 365.  Developers who purchase $99 to $1,799 software exercise at least a similar level of care as the purchasers in *A & H Software* and *McNeil Nutritionals*.  The Court also finds that the testimony of Williamson and Spencer demonstrates that buyers of the parties' products are careful and conduct due diligence before making a purchase.  Software developers who prototype a product they are considering purchasing are certainly more careful and attentive, in the aggregate, than purchasers of artificial sweeteners or women's swimwear.

The Court finds that Dr. Wong's affidavit to the contrary contains nothing more than bald, self-serving contentions.  At the summary judgment stage, a party cannot stand on self-serving, largely unsupported conclusions to create a genuine issue of material fact for trial.  *See Freedom Card*, 432 F.3d at 478, 481; *see also Metro Publ'g, Ltd. v. San Jose Mercury News, Inc.*, 861 F. Supp. 870, 876 n.4 (N.D. Cal. 1994) ("the things which may or may not be going on in [the founder of a firm alleging trademark infringement's] mind are of little concern to this

Court"). Wong's conclusory assertions, based on nothing more than his opinion, that some purchasers are unsophisticated is not a showing sufficient to create a genuine issue of material fact as to the purchasing habits of the relevant class of buyers. The Court finds that the buyers of the parties' products are sophisticated and exercise a high degree of care when making a purchasing decision. Consequently, the third Lapp factor weighs heavily in favor of defendants.

### 4. Length of Time Mark Used Without Confusion and
### Evidence of Actual Confusion (Lapp factors (4) and (6))

The Court will now simultaneously evaluate two Lapp factors that "significantly overlap," *Primepoint*, 545 F. Supp. 2d at 441, the length of time "ComponentOne" has used its mark without confusion and evidence of actual confusion. On one hand, "[i]f a defendant's product has been sold for an appreciable period of time without evidence of actual confusion, one can infer that continued marketing will not lead to consumer confusion in the future. The longer the challenged product has been in use, the stronger this inference will be." *Versa Prods.*, 50 F.3d at 205; *Checkpoint Sys.*, 269 F.3d at 291. On the other hand, "[e]vidence of actual confusion is not required to prove a likelihood of confusion." *Checkpoint Sys.*, 269 F.3d at 291. Contending that actual confusion exists in the marketplace, ComponentOne submits evidence of alleged confusion events, both of the source and initial interest variety, and a survey it commissioned. Defendants argue the confusion evidence ComponentOne has presented is unreliable and *de minimis* and its survey is bereft of evidentiary value because of methodological flaws.

### a. Actual Confusion Evidence

The Court of Appeals for the Third Circuit has stated that "evidence of actual confusion

may be highly probative of the likelihood of confusion" because of the difficulty in discovering

instances where consumers or other third parties exhibit confusion.  *Id.*  Nevertheless, while "it

takes very little evidence to establish the existence of . . . actual confusion," *McNeil Nutritionals*,

511 F.3d at 366 (quoting *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1544 (11th Cir 1986)), "a

district court may weight the sixth *Lapp* factor in favor of a defendant when it concludes that the

evidence of actual confusion was isolated and idiosyncratic."[15]  *Id.* (quoting *A & H Sportswear*,

237 F.3d at 227) (internal quotation mark omitted); *see also Scott Paper*, 589 F.2d at 1231

(extremely minimal evidence of actual confusion does not establish a "pattern of confusion in the

marketplace").  With respect to actual confusion, the Court of Appeals for the Third Circuit has

instructed, "[i]t is within the District Court's discretion to consider the facts, and weigh them."[16]

*A & H Sportswear*, 237 F.3d at 227.

ComponentOne offers twenty-eight alleged confusion events as evidence that consumers

---

[15]The Court of Appeals for the Third Circuit made a somewhat contradictory observation in *Kos Pharms.*, where it stated, "Without knowing how many, or what percent of, incidents go unreported, anecdotal evidence of confusion cannot usefully be compared to the universe of potential incidents of confusion."  369 F.3d at 720.  If this statement were literally true, a district court could never find that evidence of actual confusion was "isolated."  Since this language is in apparent conflict with that Court's later pronouncements in *Freedom Card* and *McNeil Nutritionals* that evidence of actual confusion can be considered *de minimis* in appropriate circumstances, *see Freedom Card*, 432 F.3d at 478-79 (affirming a district court's conclusion that the evidence of actual confusion was "*de minimis*" and "does not establish a genuine issue of fact"); *McNeil Nutritionals*, 511 F.3d at 366 (finding "neither precedent nor common sense supports" the proposition that "even one piece of evidence of actual confusion compels a weighing of the sixth *Lapp* factor in favor of a plaintiff"), this Court concludes the language in *Kos Pharms.* does not prevent a district court from finding that a small number of confusion events amount to a *de minimis* showing for purposes of the fourth and sixth Lapp factors.

[16]Of course, at the summary judgment stage, the Court "weighs" the facts for the sole purpose of determining whether ComponentOne has presented a genuine issue of material fact for trial on the likelihood of confusion issue.  *See E.T. Browne*, 538 F.3d at 196.

in the parties' market are confused because of the similarities of the parties' marks.  The evidence includes:

•   An affidavit of Geoffrey Lusty, ComponentOne's former director of marketing, stating that anonymous individuals approached him at a VSLive! trade show held in San Francisco in the winter of 2006 exhibiting what Lusty interpreted as confusion between ComponentOne and ComponentArt.  Each firm had a booth at the trade show.  According to Lusty, one individual declined ComponentOne literature, telling Lusty, "I already received your stuff from your other booth."  After Lusty explained "we were not the same company as the company at the other booth," the anonymous individual "explained that our names were very similar, so he was confused."  Moskal Decl., Ex. 32.

•   Lusty's statement in the same affidavit that at the same trade show, another anonymous individual approached him at the ComponentOne booth stating that the individual was familiar with ComponentOne because of previous trade shows.  According to Lusty, the individual then stated that he forgot ComponentOne's name, and, while searching for ComponentOne online, he came across ComponentArt's webpage and mistakenly thought it was ComponentOne.  The individual then mistakenly purchased ComponentArt's products even though he "originally intended to purchase" ComponentOne's products.  *Id.*

•   Lusty's statement in the same affidavit that at the same trade show, another anonymous individual approached him at ComponentOne's booth and inquired as to whether ComponentArt was reselling ComponentOne's products.  *Id.*

- Lusty's statement in the same affidavit that at the same trade show, another anonymous individual approached him at the ComponentOne booth, "glanced at our sign with a recognizable puzzled look, and asked 'Is there another ComponentOne here? I think I just talked with you guys over there.'" The individual then pointed to the ComponentArt booth. *Id.*

- Lusty's statement in the same affidavit that at the TechEd 2006 trade show in Boston an anonymous individual approached ComponentOne's booth appearing confused. After Lusty asked the individual if he needed help, the individual replied that "he was confused about who our company was in comparison to the other ComponentOne at the show." Lusty "surmised that he was talking about ComponentArt's booth" at the same show. *Id.*

- An affidavit of Juback stating that at the Microsoft PDC trade show in Los Angeles in September 2005, Kent Watson, a programmer at Tyson Foods, Inc., made an inquiry about ComponentOne's products. After Juback informed Watson that he was inquiring into products that ComponentOne does not manufacture, Watson responded, "I'm confusing you with ComponentArt."[17] Moskal Decl., Ex. 14.

- Juback's statement in the same affidavit that, at the same show, Don Piluso, a Senior Manager at Hitachi Consulting, approached ComponentOne's booth and, after looking at the signs, stated, "Isn't there another ComponentOne here?"[18] *Id.*

- Juback's statement in the same affidavit that at a Microsoft Conference in San Jose in

---

[17]Watson's recollection of this interaction has not been provided to the Court.

[18]Again, ComponentOne has not provided this Court with Piluso's testimony regarding this interaction.

February 2008, "[a]n individual named Michael Powers approached [Juback], and asked "Aren't you the guys in Canada?"  *Id.*

- Juback's statement in the same affidavit that, at the same conference, a Microsoft employee named Steve Goodyear approached Juback and inquired, "Are you in Toronto?"  *Id.*

- An affidavit of Dr. Wong stating that at the PDC-05 trade show in Los Angeles an anonymous individual approached him and "asked . . . if ComponentOne and ComponentArt were affiliated or the same company."  After Dr. Wong informed the individual that he was confused, the individual "responded that since he was not sure which company he wanted to talk with, he was going to talk to both."  Moskal Decl., Ex. 15.

- Dr. Wong's statement in the same affidavit that, at the same show, another anonymous individual approached him and "explained that he was confused between the two company names.  He said he first saw the ComponentArt booth and then later saw the ComponentOne booth.  He said he remembered the first company/booth he saw was 'Component-something' but seeing the ComponentOne name in front of him, he was no longer sure if the one he saw before was 'One' or something else.  He was not sure if he saw two different names or the same name, as he had seen two different booths at different locations.  So, he went to look for the first 'Component' company he saw and verified that there were two different names."  *Id.*

- Dr. Wong's statement in the same affidavit that, apparently at the same show, "[o]ther individuals . . . approached me confused about the two company names, not quite sure if

they were the same or affiliated in some way." *Id.*

- Dr. Wong's statement in the same affidavit that at the VSLive trade show in San Francisco in the winter of 2006 that is the subject of parts of Lusty's testimony, an anonymous individual told Dr. Wong that he was considering using products that the parties' manufacture. Although the anonymous individual "had heard about ComponentOne some time ago from friends," he saw the listing of both ComponentOne and ComponentArt in the exhibitors list and was quite certain, although not 100% that his friends had said ComponentOne, but decided to visit and check out both booths/companies to make sure." *Id.*

- Dr. Wong's statement in the same affidavit that, at the same show, an anonymous individual who, according to Dr. Wong, had previously used VideoSoft's products and desired to use ComponentOne's latest versions of those products, approached Dr. Wong and "said he was confused by ComponentOne and ComponentArt." According to Dr. Wong, the individual "said he visited one of the company's booth and then saw the other so he went back to look to make sure there were two similar, but different company names." *Id.*

- Dr. Wong's statement in the same affidavit that, at apparently the same show, another anonymous individual approached him and stated, after looking at the list of companies on the exhibitor list, that he was making a point to visit the booth of a company with a "similar . . . name next to ComponentOne's" after originally planning to visit ComponentOne's booth. *Id.*

- Dr. Wong's statement in the same affidavit that, at apparently the same show, "other individuals had similarly approached me with confusion between the two company names, asking if affiliated [sic] in some way." *Id.*

- An affidavit of Emily McMahon, a sales representative of ComponentOne, stating that on April 2, 2008, she received a telephone call from Dean Efpatridis of Nutreco Canada, Inc., in which Efpatridis stated that he wanted to return a product he purchased from ComponentOne the previous day. According to McMahon, when she inquired as to why he wanted to return the product, Efpatridis responded, "I was supposed to purchase ComponentArt's product for our developers . . . It was my fault, but there was only a three letter difference." Attached to the affidavit is an email that Efpatridis purportedly sent to McMahon two days later stating, "As per our discussion, the reason for the return is that I inadvertently purchased the Component One [sic] Suite as opposed to the ComponentArt suite that the developers had prototyped with." Moskal Decl., Ex. 12.

- A series of emails from a potential customer, attached to an affidavit of ComponentOne sales executive Jennifer Wilson, in which the customer, responding to a sales pitch from Wilson after the customer apparently downloaded a trial version of a ComponentOne product, inquired, "Do you have a URL that would lead me toward example code for Component Art [sic] grid?" Moskal Decl., Ex. 13.

- Another email attached to Wilson's affidavit in which a reseller inquired as to whether it could apply its discount to a license renewal of a ComponentArt product for a customer who had already received a price quote for the renewal from ComponentArt. The reseller copied ComponentOne's sales department onto the email. *Id.*

- An email to ComponentOne from a reseller asking for a price quote for a ComponentOne product and a ComponentArt product. A ComponentOne employee responded, telling the reseller, "ComponentArt is not one of our products." Two days, later the same reseller entered into an electronic chat session with a ComponentOne customer service representative and posed the same question. Moskal Decl., Ex. 33.

- A series of emails between a potential customer and ComponentArt's sales department in which the customer initially inquires about product license prices for a ComponentArt product. A few days later and after receiving a price quote, the customer, whose command of English is poor, provides ComponentArt sales with a list of ComponentOne products and asks which ComponentOne product it should buy. After Milena Braticevic, ComponentArt's manager of sales and marketing, informs the potential customer that ComponentArt and ComponentOne are different companies, the customer again inquires into the cost of obtaining ComponentArt product licenses. Moskal Decl., Ex. 34.

- An email from a developer to ComponentArt's support department seeking advice on using ComponentOne's product. Moskal Decl., Ex. 35.

- An email from Milena Braticevic to a contact at an industry magazine in which Milena Braticevic requests that the magazine correct an error it made in listing the products that have been nominated for an award. In the listing of products nominated, the magazine had described ComponentArt's product as "ComponentOne Web.UI Navigation Controls for ASP.NET" when it should have been listed as "ComponentArt Web.UI Navigation Controls for ASP.NET." Moskal Decl., Ex. 36.

- A series of emails between a firm seeking a partnership with ComponentArt and Miljan Braticevic in which the firm wrote, "Component One's [sic] Product Key" when it purportedly meant to write "ComponentArt's Product Key." Moskal Decl, Ex. 37.

- A series of emails between the winner of a product raffle and various people involved in the raffle in which the winner asks for the "ComponentOne license" he won. The winner actually received a ComponentArt license. Moskal Decl., Ex. 38.

- A series of emails that commenced when McMahon contacted a potential customer following a trade show. Responding to McMahon's solicitation, the potential customer states, "We have a component one [sic] subscription that we are interested in updating to the latest version. I have two packages from it, ComponentArt WebUI 2006.2 and ComponentArt WebChart 2006.2." McMahon then informs the potential customer that the products he referred to are not ComponentOne products and asked for "more information why you thought ComponentArt['s products] were part of a ComponentOne subscription?" The potential customer responded, "Component this, Component that, you know how it is." McMahon Supplemental Aff., Ex. A.

- A website displaying various "grid" components that has a product listing where the heading describes a ComponentArt product and the body of the listing describes a ComponentOne product. Eydelsteyn Supplemental Aff., Ex. A.

- An email in which a purchasing agent of a ComponentArt customer mistakenly sent an order for a product license to ComponentOne. Wilson Supplemental Aff., Ex. A.

Preliminarily, defendants object that the Court cannot evaluate alleged actual confusion instances that contain inadmissible hearsay. Evidence proffered to defeat a motion for summary

judgment must be capable of admission at trial. *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1234 n.9 (3d Cir. 1993). ComponentOne counters that all statements it has proffered that fit within this definition are admissible pursuant to the "state of mind" hearsay exception contained in Fed. R. Evid. 803(3).[19]

The Court agrees with defendants that certain evidence is inadmissable hearsay and cannot be considered at this stage of the dispute. The portion of Lusty's affidavit concerning the anonymous individual he met at the VSLive! trade show who relayed a story about a mistaken purchase of ComponentArt's products, the portion of McMahon's first affidavit regarding her interaction with Efpatridis other than when she recounts that Efpatridis stated he, "wanted to return a product he purchased from ComponentOne the previous day," and McMahon's statement in her supplemental affidavit where she asked a customer why he confused ComponentOne and ComponentArt in an email and the customer responded, "Component this, Component that, you know how it is," must be excluded. All of these statements are hearsay[20] and are not eligible for any of the exceptions provided in the Federal Rules of Evidence. Most of the remaining confusion evidence is not hearsay because the statements contained in the

---

[19]Fed. R. Evid. 803(3) provides that hearsay is admissible if it

> is a statement of the declarant's then existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

[20]"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c).

affidavits and emails are not offered to prove the truth of the matter asserted, (i.e., Goodyear's inquiry of Juback, "Are you in Toronto?").  *See Kos Pharms.*, 369 F.3d at 719 (statements exhibiting confusion "are not hearsay because they are not submitted for their truth . . . it is their falsity that shows the speaker's confusion").  The rest of the statements are hearsay, (i.e., Watson's statement to Juback, "I'm confusing you with ComponentArt."), but are admissible pursuant to Rule 803(3) because they are statements of the declarant's then existing state of mind or plans.  *Kos Pharms.*, 369 F.3d at 719.

Having established that the Court may consider twenty-seven of the twenty-eight alleged actual confusion instances ComponentOne has submitted, omitting the portions of McMahon's affidavits mentioned above, the Court must now determine the effect of that evidence on the fourth and sixth Lapp factors.  In doing so, the Court is aware that, "in general, actual confusion evidence collected by employees of a party in a trademark action must be viewed with skepticism because it tends to be biased or self-serving."  *Citizens Fin.*, 383 F.3d at 122; *Checkpoint Sys.*, 269 F.3d at 298; *A & H Sportswear*, 237 F.3d at 227.  In order for an alleged actual confusion event to be probative of a likelihood of confusion, there must be "a causal connection between the use of similar marks and instances of actual confusion.  Evidence must be viewed in context." *Rockland Mortgage*, 835 F. Supp. at 197.

Viewing the aforementioned instances of alleged actual confusion in their proper context, the Court concludes that they do not function to weigh the sixth Lapp factor in ComponentOne's favor.  The Court must view the alleged confusion events within the proper universe of the parties' interactions with third parties  *See Checkpoint Sys.*, 269 F.3d at 298-99 (juxtaposing number of actual confusion instances with "the large number of e-mails, customer inquiries, and

other communications the[] [parties] receive on a daily basis"); *see also EMSL Analytical*, 2006 WL 892718, at *10 (same). From the time that Cyberakt changed its name to "ComponentArt" in May 2004 until August 2007, ComponentOne averaged over 11,000 customer inquiries per month.[21] Gelchinsky Decl., Ex. Z, AA. This number includes trade show inquiries, evaluation support contacts, sales and information emails, and customer service and pre-sales calls. Gelchinsky Decl., Ex. Z. During the same period, ComponentArt received an average of over 1,250 customer inquiries per month.[22] Rolufs Decl. ¶¶ 89-95. Assuming that each of the admissible alleged confusion instances ComponentOne has submitted represent events where an individual was actually confused because of the similarity of the parties' marks, twenty-seven confusion events in more than 490,000 interactions[23] with third parties, customers and otherwise, since Cyberakt changed its name to "ComponentArt" is a *de minimis* showing of confusion. *See Scott Paper*, 589 F.2d at 1231(nineteen misdirected letters that the parties received during a period in which one party sold 50 million cans of its products is "extremely minimal evidence" and does not demonstrate "a pattern of confusion in the marketplace"); *Checkpoint Sys.*, 269 F.3d 298-99 (finding a showing of twenty instances of initial interest confusion *de minimis* when the

---

[21]This number could be higher because ComponentOne provided incomplete customer inquiry data. Gelchinsky Decl., Ex. Z.

[22]According to Rolufs, this number "understates the true quantity of [ComponentArt's] trade show inquiries, because it does not include the hundreds of individuals who visited [ComponentArt's] booths at the trade shows but did not request information or any follow up." Rolufs Decl. ¶ 96.

[23]The actual number of the parties' interactions with third parties is much higher than 490,000. While ComponentOne has submitted alleged actual confusion events that occurred as recently as May 28, 2008, Wilson Supplemental Aff., it has only provided the number of customer interactions that occurred on or before August 2007. Gelchinsky Decl., Ex. Z. Moreover, the data ComponentOne has supplied on customer interactions is incomplete. *Id.*

number of instances are compared with "the size of the companies, and the large number of e-mails and customer inquiries, and other communications they receive on a daily basis"); *EMSL Analytical*, 2006 WL 892718, at *9-*10 ("Given that EMSL works on approximately 233,000 projects each year, let alone the number of customer inquiries that both parties receive annually, 15-20 instances of confusion does seem de minimis."). ComponentOne's actual confusion demonstration is certainly not strong enough to weigh the sixth Lapp factor in its favor.

The strength of the actual confusion events ComponentOne presents is further undermined when the Court considers the nature of some of the evidence. The probative value of a misdirected communication, like the emails ComponentOne has submitted, is decreased when the Court cannot tell whether the mistake resulted from the author's confusion of the parties' similar marks or from inadvertence. *See Checkpoint Sys.*, 269 F.3d at 298; *see also Duluth News-Tribune v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1098 (8th Cir. 1996) (misdirected communications that are not a result of the sender's confusion of the parties' marks are not evidence of actual confusion). Here, of the eleven emails ComponentOne proffers as evidence of confusion on the part of the sender, at least eight could easily be explainable as either inadvertently sent to the incorrect party or, in the instance where ComponentOne's sales address was copied onto an email seeking a quote for a ComponentArt product license, a deliberate attempt to create a price war between the firms. ComponentOne has not provided affidavits or testimony on the part of the authors of the misdirected communications that would provide the Court with useful context for evaluating whether the communications were the result of confusion between the parties marks. As such, the Court cannot find, at the summary judgment stage, that these vague communications, which may or may not be confusion even when viewed

in a light most favorable to ComponentOne, create a genuine issue of material fact as to actual confusion. *See Metro Publ'g*, 861 F. Supp. at 878 (discounting evidence of third party confusion at the summary judgment stage when "there is no indication in most of these declarations as to why the third parties were confused"). ComponentOne, the party with the ultimate burden of proof at trial, had the ability to depose the authors of the misdirected communications and chose not to.[24] The Court concludes that the glaring absence of explanations as to the reason for the misdirected communications undermines their value as evidence of actual confusion. *See Duluth News-Tribune*, 84 F.3d at 1098 ("vague evidence of misdirected phone calls and mail is hearsay of a particularly unreliable nature given the lack of opportunity for cross-examination of the caller or sender regarding the reason for the 'confusion'").

Moreover, of the twenty-seven admissible instances of actual confusion that allegedly occurred, most were presented in the affidavits of current and former ComponentOne employees Lusty, Juback, McMahon, Wilson, and Dr. Wong. The Court must approach these statements with a healthy amount of skepticism and cannot accord much evidentiary value to them. *See, e.g., EMSL Analytical*, 2006 WL 892718, at *10 (resting a finding that actual confusion evidence did not weigh in favor of the party alleging infringement partially on the fact that "all of the evidence of actual confusion was reported by . . . and presented in affidavits and testimony by . . . employees" of the party alleging infringement). Further, while admissible as evidence of actual confusion, the value of many of the statements is diminished because they are vague and involve anonymous declarants. ComponentOne's contention that the actual confusion evidence it has

---

[24]Parties in trademark infringement actions within the Third Circuit have previously chosen to submit affidavits or testimony on behalf of the authors of misdirected communications. *See, e.g., Scott Paper*, 589 F.2d at 1231.

presented indicates a likelihood of confusion is even further weakened because of Dr. Wong's instruction to ComponentOne employees to pay attention to any customer confusion with ComponentArt prior to the San Francisco VSLive trade show on February 6, 2005. Gelchinsky Decl., Ex. J, KK. The evidentiary value of employee-reported alleged actual confusion events drops when "a party has been actively searching for instances of confusion and finds a few." *Id.* (citing *SeeSun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan*, 651 F.2d 311, 319 (5th Cir. 1981)).

Viewing all of the actual confusion evidence and considering the relevant law, the Court concludes that the evidence ComponentOne has presented amounts to only "isolated and idiosyncratic" instances of actual confusion that cannot create a genuine issue of material fact solely on the basis of its alleged actual confusion evidence with respect to the respect to the fourth and sixth Lapp factors.

### b. Survey Evidence

Perhaps recognizing the *de minimis* nature of its direct evidence of actual confusion, ComponentOne has offered the opinion of Robert Klein, an expert ComponentOne hired "to design, execute and analyze a market research survey to determine the extent to which confusion occurs or is likely to occur in the marketplace." Moskal Decl., Ex. 50. "In borderline cases where evidence of actual confusion is not available or is not overwhelming, the gap should be filled by a properly conducted survey of the relevant class of prospective customers of the goods or services at issue." *Urban Outfitters v. BCBG Max Azria Group, Inc.*, 511 F. Supp. 2d 482, 498 (E.D. Pa. 2007) (quoting 4 McCarthy on Trademarks § 23:17). A survey can serve as circumstantial evidence of actual confusion, "but only to the extent that the survey replicates the real world setting in which instances of actual confusion would occur." *Id.*; *see also We Media*

*Inc.* 218 F. Supp. 2d at 474 ("Germane survey evidence should make some effort to compare the impressions the marks have on potential customers under marketplace conditions"). ComponentOne asserts that Klein's survey demonstrates actual confusion in the parties' market.

Klein conducted a survey over the internet using a panel of respondents recruited by the firm Authentic Response. Moskal Decl., Ex. 50. According to Klein, Authentic Response targeted respondents "whose titles indicated involvement with the IT process."[25] *Id.* The targeted respondents were emailed an invitation to participate in the survey and offered a $5 reward for completing it. *Id.* 454 individuals in the targeted group responded and completed the survey between August 28 and October 16, 2007. *Id.*

The survey commenced with an "introductory screen" that assured the respondents, *inter alia*, that the survey would only take five minutes to complete and that they would not receive sales solicitations based on their answers. *Id.* Respondents were then presented with a series of screening questions. In order to qualify for the survey, a respondent had to affirm that they lived in the United States, developed software using Microsoft Visual Studio, were familiar with components and how they are used with Microsoft Visual Studio, and do not develop or work for a company that develops components for sale to users of Microsoft Visual Studio. *Id.* If the respondent answered "yes" to each question, they were presented with a second series of screening questions. Respondents were then required to answer "yes" to at least one of the following questions:

(1) "Have you ever used a component purchased from a company other than

---

[25]Recruited individuals had titles such as, "CIO, CTO, Developer, Director of IS/MIS/IT, IT Management, [and] Programmer/Developer." Moskal Decl., Ex. 50.

Microsoft?";

(2) "Have you considered using a component purchased from a company other

than Microsoft in the past 2 years?"; and

(3) "Would you consider using a component purchased from a company other

than Microsoft in the next year?"

*Id.* If the respondent satisfactorily answered that question, a final screening question was then

posed, "What would be your role in deciding to purchase a particular component for your use?"

*Id.* Respondents who checked the box next to the response for either "Identify the need for a

component," "Identify alternative components to be considered," "Recommend the component to

be purchased," or "Make the final purchase decision" qualified for the survey. *Id.*

Qualifying respondents were then shown the "introduction to stimulus screen," which

stated, "You will now see a description of a company that sells .NET components. When you are

ready to view the description, click the button below. Once you have finished, close the window

and click 'Next' to continue the survey." *Id.* After clicking the "View Description" button at the

bottom of the screen, respondents were randomly assigned to either the "main test," "main

control," "supplemental test," or "supplemental control" survey. *Id.* In the "main test" survey,

respondents were then shown the "ComponentArt" name in a large block letters followed by a

description of the company taken from its website as the survey's stimulus. *Id.* In the "main

control" survey, the stimulus was the same in all respects to the "main test" stimulus except that

"Cyberakt" replaced the word "ComponentArt" wherever it appeared. *Id.* In the "supplemental

main" survey, the stimulus was the "ComponentOne" name in large block letters followed by a

description of ComponentOne that appeared on the sponsors webpage for the Fall 2007 "Mobile Connections" trade show. *Id.* In the "supplemental control" survey, respondents were shown the same Cyberakt stimulus as in the "main control" survey. *Id.* Respondents were allowed to view the stimulus for as long as they wished, but once they clicked the "Next" button they could not return to the stimulus. *Id.*

After viewing the stimulus, respondents were given a series of three multiple-choice questions to answer that concerned their component purchasing habits. *Id.* Klein reported that he designed this series of questions to distract the respondents from the survey's main purpose – measuring confusion between the parties' marks. *Id.*

Following the "distraction" questions, the respondents were asked, "If you see the name of the company whose description you viewed earlier [in the stimulus], check the radio button next to it. CHOOSE ONE ONLY". *Id.* Respondents of the "main test" and "supplemental test" surveys were then given the choice of clicking the radio box next to the names "Dundas Software," "Infragistics," "Xceed," "Syncfusion," "ComponentArt," "telerik," "ComponentOne," "None of the Above," or "Don't know/No opinion" for their answer. *Id.* In the "main control" and "supplemental control" surveys, "Cyberakt" replaced "ComponentArt" in the list of choices. *Id.* Klein explained his list of possible answers was chosen because it comprised "companies that sold components including ComponentOne and ComponentArt (or Cyberakt)." *Id.* The list of potential answers was randomized for each participant "to avoid any order effects." *Id.*

The next question presented the respondents with the same randomized list of potential answers except the answer that the respondent chose in the preceding question, if any, and asked, "Which, if any, of the following companies is associated or affiliated with the company whose

46

description you viewed earlier [in the stimulus]?" *Id.* If the respondent chose one or more of the given responses to that question, he was asked a follow up question for each chosen answer asking why the respondent believed that the firm "is associated or affiliated with the company whose description you viewed earlier?" *Id.* The respondent was able to type an answer to that question. *Id.*

Respondents were then presented with a randomized list of URLs belonging to the companies listed in the preceding two questions and asked, "Which, if any of the following URLs would direct you to a web page for the company whose description was seen earlier?" *Id.* Next, the respondents were given a list of those companies' products and queried, "Which, if any, of the following products is put out by the company whose description you viewed earlier?" *Id.* Finally, the respondents were asked to enter the year in which they were born and indicate their sex. *Id.*

Klein counted a respondent as "confused" if they gave an incorrect answer to the questions asking (1) which companies' description did you see earlier in the stimulus, (2) which company, if any, are associated or affiliated with that company, (3) which of the URLs refers to that company, or (4) which product is produced by that company. *Id.* Tabulating the results and controlling for confusion measured in the "control" surveys that used the "Cyberakt" description as the stimulus, Klein found that the net confusion of the main survey was 22.0% and 13.3% for the supplemental survey. *Id.* Based on those calculations, Klein stated, "In my opinion and with a reasonable degree of professional certainty, the results of the survey show that there is significant likelihood of confusion between 'ComponentArt' and 'ComponentOne.'" *Id.*

Defendants attack the survey on a number of grounds, contending that it is entitled to

little to no weight as evidence of actual confusion. They assert that Klein's survey failed to replicate marketplace conditions, employed an improper stimulus, induced respondents to confuse the parties' marks, used an improper control, was conducted in an improper format for measuring confusion between the parties' marks, and that Klein tabulated the results in a manner that artificially inflated the amount of "confusion" responses. Moskal Decl., Ex. 50.

### I. ComponentOne's Motion to Strike Defendants' References to Survey Evidence

ComponentOne has responded to defendants' attacks of Klein's survey by filing a "Motion to Strike Defendants' References to Survey Evidence," asking the Court to strike all of defendants' references to Klein's survey in its memorandum in support of summary judgment and Rule 56.1 statement of undisputed facts because they are "improper, premature and not in compliance with the Order of this Court, Federal and/or Local Rules." Pl.'s Mot. To Strike Defs.' References to Survey Evidence ¶ 5. ComponentOne contends that if defendants wanted the Court to disregard the survey at the summary judgment stage, they "should have filed for leave to file a motion in limine to exclude the survey after obtaining the motion in limine certificate as required by L.R.16.1.4(D)." *Id.* at ¶ 6.

Contrary to ComponentOne's contention, if survey evidence is lacking in probative value or fundamentally flawed a court may find, at the summary judgment stage, that it cannot function to create a genuine issue of material fact for trial. *See E.T. Browne*, 538 F.3d at 195-196; *see also Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984). While the Court recognizes that it cannot "engage in inappropriate weighing of the evidence," *id. E.T. Browne,* 538 F.3d at 196, it can determine whether Klein's survey creates a genuine issue of

material fact pursuant to the fourth and sixth Lapp factors. Accordingly, the Court will deny ComponentOne's Motion to Strike Defendants' References to Survey Evidence.

Turning to the evidentiary value of the survey, the Court of Appeals for the Third Circuit has commented, "[t]he probative value of a consumer survey is a highly fact-specific determination and a court may place such weight on survey evidence as it deems appropriate." *Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d 125, 134 (3d Cir. 1994) (quoting *Weight Watchers Int'l, Inc. v. Stouffer Corp.*, 744 F. Supp. 1259, 1272 (S.D.N.Y. 1990)). The Court finds that Klein's survey suffers from fundamental methodological flaws that prevent it from creating a genuine issue of material fact as to actual confusion. Although defendants' argument that many grounds exist on which the Court could find Klein's survey fundamentally unsound is strong, the Court will focus on Klein's choice of stimuli.

A survey is only useful as evidence of actual confusion if it replicates the conditions in which instances of actual confusion, whether of the "source" or "initial interest" variety, would occur. *See* 6 McCarthy on Trademarks § 32:163 ("the closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater evidentiary weight of the survey results"). ComponentOne's industry witness Williamson, CEO of a self-described "competitor of ComponentOne," sheds light on the purchasing process in the parties' market. Williamson testified that developers generally research a product before making a purchase. Gelchinsky Decl., Ex. O. In order to conduct this research, developers typically look at the producer's website, check a reseller such as ComponentSource or search for products through Google or other web search sites. Gelchinksy Decl., Ex. O. The survey's stimuli did not

replicate the parties marks as they would be encountered in any of these situations in which a potential purchaser would encounter the parties' products or services. Instead of using screen shots of the parties' websites, common Google searches potential purchasers would use, or ComponentSource or other resellers' product listings, Klein presented the parties' marks on a plain background in large block letters followed by descriptions of the companies Klein gathered from ComponentArt's website and a listing of sponsors (not vendors) for a trade show.

ComponentOne fails to present evidence demonstrating that potential purchasers or other third parties encounter the parties' marks in the manner presented in the stimuli of Klein's survey. Instead, in an apparent attempt to create an issue of material fact, it offers an affidavit of Klein that contains the bare assertion, "the [survey respondent's] exposure of the ComponentOne mark and the ComponentArt mark were exactly as they would be seen in listing of vendors of this software that I observed." Moskal Decl., Ex. 31. Neither Klein nor ComponentOne states where Klein observed listings of the ComponentOne and ComponentArt marks presented in this matter. Klein did not, however, make his observation on parties' websites, in Google search results or on the websites of resellers. ComponentOne defends Klein's choice of stimuli by merely asserting, "[t]he capitalized two letters is how the market pervasively uses the names, in emails, in typing, etc., in a straight-forward common-sense manner." Pl.'s Mem. in Opp'n Summ. J. 35. Perhaps ComponentOne is correct that the market uses the marks in that manner, but it has failed to demonstrate, or even argue, that participants in the market *encounter* the marks as they were presented in the survey's stimuli. Had Klein shown screen shots of the parties' websites, or reseller listings, or Google search results, the capitalization convention would have remained as "the market pervasively uses" it, and the survey respondents would have

encountered the marks as they exist in the marketplace.

The Court finds that the stimuli Klein employed are completely divergent from the conditions that potential purchasers encounter in the parties' marketplace. Klein's survey "essentially measured the respondents' word associations devoid of context." *We Media*, 218 F. Supp. 2d at 474. Since the survey failed to replicate market conditions, the Court affords it extremely minimal weight as circumstantial evidence of actual confusion. The survey, therefore, cannot serve as a meaningful measure of either source or initial interest confusion under the fourth or sixth prong of the Lapp calculus.

### c. Conclusion

With respect to the fourth and sixth Lapp factors, the Court concludes that ComponentOne has failed to demonstrate, through direct or circumstantial evidence, that more than *de minimis* confusion between the parties' marks has occurred in third parties since defendants' adopted "ComponentArt" as the name of their firm in May 2004. Consequently, the Court finds that ComponentOne has not generated a genuine issue of material fact as to actual confusion and that the fourth and sixth Lapp factors weigh in favor of defendants.

### 5. Intent of the Defendants in Adopting the Mark (Lapp factor (5))

The Court will now examine the intent of defendants in adopting the "ComponentArt" mark. Intent "is relevant to the extent that it bears on the likelihood of confusion." *A & H Sportswear*, 237 F.3d at 225. The Court of Appeals for the Third Circuit has opined that if ComponentOne can demonstrate that, in adopting the "ComponentArt" mark, defendants intended to create confusion among consumers in the parties' market between its products and ComponentOne's, a likelihood of confusion may be indicated. *See id.* at 225-26.

ComponentOne points to several pieces of circumstantial evidence it views as demonstrating defendants' intent to confuse consumers. At the time they chose "ComponentArt" to replace "Cyberakt" as the name of their firm, Rolufs, Dusan Braticevic and Miljan Braticevic were aware of ComponentOne and intended to compete with it. Moskal Decl., Ex. 1, 2, 3. In choosing "ComponentArt," ComponentOne argues that defendants picked a mark so similar to "ComponentOne" that "to assert no intent is incredulous." Pl.'s Mem. in Opp'n Summ. J. 23.

ComponentOne also assails Rolufs, Dusan Braticevic and Miljan Braticevic's alleged failure to conduct due diligence with respect to potential trademark infringement in the name selection process, especially because they knew they "were not legally permitted to choose a name . . . confusingly similar to another company's name." Moskal Decl., Ex. 1, 2, 3. As evidence of their purported due diligence dereliction, ComponentOne observes that defendants (1) did not perform any trademark searches using third parties to determine the availability of the "ComponentArt" mark, *id.*; (2) did not instruct their legal counsel to engage a trademark search company to assure name availability before selecting the mark, *id.*; (3) did not obtain an opinion letter from their legal counsel on name availability, *id.*; and, (4) only performed "a limited domain name search for domain name availability." *Id.*; Pl.'s Mem. in Opp'n to Summ. J. 26-27.

As further circumstantial evidence of an intent to confuse consumers, ComponentOne points to defendants' decision to not attempt to register their mark in the United States, even after defendants conducted a name availability search for the "ComponentArt" mark with the PTO. *Id.* ComponentOne suggests that the "reasonable inference" to be derived from defendants' decision is that any attempt at registering the mark with the PTO would have been denied. *Id.* ComponentOne also attaches significance to the fact that ComponentArt has represented the

"ComponentArt" mark as a trademark and licensed it to third parties.  *Id.*   Finally,

ComponentOne points to an affidavit of Dr. Wong in which he states that ComponentArt names

its products in a manner similar to ComponentOne, and that ComponentArt, on at least one

instance, changed the name of its product so that it used the identical naming convention as

ComponentOne.  Moskal Decl, Ex. 15 (ComponentArt originally named a product

"ComponentArt ASP.NET Menu, but then changed to ComponentArt Menu for ASP.NET, the

identical naming convention as ComponentOne's.").  ComponentOne argues that the reasonable

inference to draw from the aforementioned evidence is that defendants intended to infringe upon

its mark in selecting the "ComponentArt" mark.  Pl's Mem. in Opp'n Summ. J. 26-27.

Accordingly, ComponentOne contends that it has demonstrated that a triable issue of fact

remains with respect to defendants' alleged bad faith in selecting the "ComponentArt" mark.  *Id.*

at 24.

   The Court has conducted an independent review of the record and has found additional

evidence of defendants' intent in choosing the "ComponentArt" mark.  In a March 29, 2005

email, before ComponentOne filed its original complaint in this action, Rolufs asked Milena

Braticevic whether she could contact ASP.NET Pro magazine and inquire whether the magazine

would change the manner that ComponentArt's products were listed in nominations for its

"Readers' Choice Awards."  Moskal Decl, Ex. 39.  Describing how he would like to have the

description of the products amended in the award nominations, Rolufs wrote, "we'd like our

listing similar to ComponentOne's listing, with the company name in the product name."  *Id.*

   Defendants characterize their actions in choosing the "ComponentArt" mark as

characteristic of "a young company acting deliberately and carefully to develop and perfect a new

brand identity designed to distinguish it from *all* its competitors." Defs.' Mem. in Supp. Summ.

J. 48. They contend that the "ComponentArt" mark was selected "as the result of sound business

planning, and not for the purpose of trading upon Plaintiff's goodwill or otherwise harming

Plaintiff." *Id.* To support their argument, defendants list the steps they allegedly took in their

name-selection process, arguing that it shows that they made a careful, deliberate, good faith

decision in choosing "ComponentArt" as the new name for Cyberakt.[26]

The Court does not need to find that defendants have demonstrated that no genuine issue

of material fact exists with respect to their intent in selecting "ComponentArt" as the new name

for Cyberakt in order to determine the proper effect of the fifth Lapp factor in the likelihood of

confusion analysis. Viewing the facts in the light most favorable to ComponentOne, as is

required at this stage of the dispute, the Court agrees with ComponentOne that a reasonable juror

could find that defendants acted recklessly or carelessly with respect to potential trademark

---

[26]According to defendants, the process of renaming Cyberakt lasted for two years, from May 2002 until May 2004. Gelchinsky Decl., Ex. C. During that time, Miljan Braticevic and Rolufs compiled a list of potential new names for Cyberakt. Rolufs Decl. ¶ 4. Miljan Braticevic, Rolufs, Dusan Braticevic and Cyberakt Senior Developer Jovan Milosevic debated the relative merits of each potential name, *id.* at ¶ 9, and "examined the marketplace and ensured that no other component vendor used a name or mark that conveyed the same or similar message." *Id.* at ¶ 13. By December 29, 2002, "ComponentArt" was the "front-runner" among the potential name choices, so Cyberakt registered the "componentart.com" domain name. *Id.* at ¶ 7. After further debate over the names, the decision to adopt "ComponentArt" as the new name for Cyberakt was made on or about January 21, 2003. *Id.* at ¶ 11. After selecting "ComponentArt," Cyberakt engaged an outside consultant to develop a logo and brand image. *Id.* at ¶¶ 23, 24, 101. To provide direction to the re-branding process, the consultant was provided with "samples of websites and logos incorporating design features [defendants] liked." *Id.* at ¶ 102. ComponentOne's logo and website "were not specifically included in that package" and not considered by the consultant in the re-branding process. *Id.* at ¶ 103. While the re-branding process occurred, defendants also hired Goodmans to restructure the corporation. *Id.* at ¶ 26. Goodmans conducted a "NUANS" search of Canadian company names and trademarks, which revealed a number of firms with the term "component" in their names and trademarks. *Id.* ComponentOne's name and trademark, however, were not uncovered in the search. *Id.*

infringement in selecting the "ComponentArt" mark. For the purpose of this opinion, moreover, the Court will even credit ComponentOne's submission, which is arguably contrary to established Third Circuit law,[27] that it is reasonable to infer from the defendants' purported careless or recklessness in selecting the "ComponentArt" mark that they acted in bad faith and with intent to wilfully infringe the "ComponentOne" mark.[28]

However, the fifth Lapp factor is not particularly helpful in determining whether a likelihood of confusion exists in this particular dispute. *See, e.g., Freedom Card*, 432 F.3d at 471 (in some cases not every Lapp factor is relevant). Considering that the parties each employ a mark containing the generic term "component," that the "ComponentOne" mark is weak, and that the parties operate in a market where the sophisticated consumers make careful, deliberate

---

[27]The Court of Appeals for the Third Circuit has commented, "carelessness is not the same as deliberate indifference with respect to another's right in a mark or a calculated attempt to benefit from another's goodwill." *SecuraComm Consulting Inc. v. Securacom Inc.*, 166 F.3d 182, 189 (3d Cir. 1999). Further, that Court has explicitly stated that it *has not* adopted "carelessness" as a standard for determining whether a party acted with the intent to confuse when choosing a particular mark. *See Freedom Card*, 432 F.3d at 479-80. That Court has, on other occasions, made suggestions to the contrary in cases, unlike the case at bar, that involve highly distinctive marks. *See Kos Pharms.*, 369 F.3d at 721 (finding "[t]he adequacy and are with which a defendant investigates and evaluates its proposed mark, and its knowledge of similar marks or allegations of potential confusion" are highly relevant to the inquiry into whether the defendant intended to "promote confusion and appropriate the prior user's good will" in choosing its mark, in a case involving a "made-up and meaningless mark") (quoting *Fisons Horticulture*, 30 F.3d at 479) (internal parentheses omitted); *see also Urban Outfitters*, 511 F. Supp. 2d at 493, 501 (finding "evidence of a defendant's carelessness in evaluating the potential confusion caused by its mark with that of a senior user is highly relevant and will tend to favor a finding of likelihood of confusion" in a case involving an arbitrary mark) (internal quotation marks omitted).

[28]The Court notes, however, that ComponentOne has not presented any evidence directly demonstrating that defendants acted with an intent to wilfully infringe the "ComponentOne" mark when they chose "ComponentArt" as the new name for Cyberakt. *See Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 173 (5th Cir. 1986) (finding that a firm did not act in bad faith when the party alleging trademark infringement did not present any direct evidence on the issue).

purchases, the Court finds that even if defendants acted with the most nefarious motives in choosing "ComponentArt" as the new mark for Cyberakt, intending to divert ComponentOne's customers, palm off its goods as ComponentOne's and take a free ride on ComponentOne's goodwill, a genuine issue of material fact as to likelihood of confusion would still not be indicated. An intent to willfully infringe cannot create confusion when confusion does not otherwise exist. *See Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-LeCoultre Watches, Inc.*, 221 F.2d 464, 466-67 (2d Cir. 1955) ("Of course, where there is no likelihood of confusion . . . an alleged infringer's intent becomes irrelevant, since an intent to do a wrong cannot transmute a lawful into an unlawful act."); *see also* 4 McCarthy on Trademarks § 23:110 (same). As the Court will explore *infra* when it balances the Lapp factors, defendants' actions have not created a likelihood of confusion. Consequently, circumstantial evidence that they had the intent to cause confusion, the subject of the fifth Lapp factor, and the direct evidence in the record of defendants' intent to copy ComponentOne's product naming conventions is unhelpful to the Court's task of determining whether a likelihood of confusion exists in this particular case.[29]

---

[29]With respect to ComponentOne's showing that questions exist as to whether ComponentArt intended to copy ComponentOne's product naming conventions, the Court notes that a demonstration that defendants' intended to copy ComponentOne's naming conventions does not automatically militate the fifth Lapp factor in ComponentOne's favor. The Court of Appeals for the Third Circuit has commented on the proper interpretation of a defendant's intent to copy in a trademark infringement dispute,

> a defendant's mere intent to copy, without more, is not sufficiently probative of the defendant's success in causing confusion to weigh such a finding in the plaintiff's favor; rather, defendant's intent will indicate a likelihood of confusion only if an intent to confuse consumers is demonstrated via purposeful manipulation of the junior mark to resemble the senior's.

*A & H Sportswear*, 237 F.3d at 225-26; *see also* 4 McCarthy on Trademarks § 23:110 ("it must be kept in mind that the only kind of intent that is relevant to the likelihood of confusion is the

**6. The Remaining Lapp Factors (Lapp factors (7), (8), (9), (10))**

As stated above, the Court of Appeals for the Third Circuit has stated that the seventh, ninth, and tenth Lapp factors, whether the goods are marketed through the same channels of trade and advertised through the same media, the relationship of the goods in the minds of consumers, and other facts suggesting that the consuming public might expect the prior owner to manufacture both products, respectively, are "not apposite" in cases that involve directly competing goods. *A & H Sportswear*, 237 F.3d at 212; *see also Freedom Card*, 432 F.3d at 482 (affirming a district court's decision to not analyze Lapp factors (7), (9), and (10) because they "are not apposite for directly competing goods"). Accordingly, the Court will not analyze those Lapp factors. *See Kos Pharms.*, 369 F.3d at 711 ("if a district court finds certain of the *Lapp* factors are inapplicable or unhelpful in a particular case, that court should explain its choice not to employ those factors") (quoting *A & H Sportswear*, 237 F.3d at 214 n.8) (internal quotation marks omitted).

Lapp factor (8), the extent to which the targets of the parties' sales efforts are the same, is similarly inapposite in this case. If a party is a direct competitor of another party the target of each parties' sales efforts are the same, *ipso facto*. As such, the Court fails in seeing why Lapp factor (8) would aid in determining the likelihood of confusion in this case. To the extent that this factor is relevant for determining a likelihood of confusion, it has already been compensated for in the lower standard for finding similarity between the marks that the Court applied in the

---

intent to confuse"). Since a showing that defendants intended to wilfully infringe the "ComponentOne" mark would not create a genuine issue of material fact as to a likelihood of confusion in the circumstances presented in this case, a showing of an intent to copy is similarly insignificant.

57

discussion of the first Lapp factor.  Inasmuch as Lapp factor (8) does come into play in the Lapp analysis in this case, the defendants apparently concede that it weighs in ComponentOne's favor for the purposes of summary judgment because they fail to address that factor in their brief. Defs.' Mem. in Supp. Summ. J. 24.

### 7. The Totality of the Lapp Factors

ComponentOne asks this Court to deny summary judgment to defendants on the basis of an examination of the parties' marks, a few misdirected emails, some self-serving affidavits and testimony of its employees and a fundamentally flawed survey.  Missing from ComponentOne's case is any evidence, other than a few self-serving comments of Dr. Wong, regarding consumers in the parties' industry, the group the Lanham Act strives to protect.  In the end, the omission of evidence on consumers and their behavior is fatal to ComponentOne's action.  *See* 4 McCarthy on Trademarks § 23:124 ("Not to be forgotten in all the discussion of inferences and presumptions is that the focus of the law of trademark and unfair competition is to prevent deception of customers.").

Due to the generic nature of the term "component" in the parties' marks, the Court concludes that ComponentOne has not created a genuine issue of material fact on the critical first Lapp factor, similarity of the parties' marks.  Without legitimate evidence on consumer behavior in the parties' market, the Court must find that the second and third Lapp factors weigh heavily in the defendants' favor.  Because ComponentOne's actual confusion evidence is flimsy and *de minimis* and Klein's survey is fundamentally flawed, no genuine issue remains with respect to the fourth and sixth Lapp factors, they also weigh in the defendants' favor.

The remainder of the Lapp factors are unhelpful for determining whether ComponentOne

has made a showing creating a genuine issue on the ultimate, material factual question in this case: the existence of a likelihood of confusion between the parties' marks. Without confusingly similar marks, or a demonstration of the commercial strength of ComponentOne's mark, or evidence that consumers of the parties' products are unsophisticated or actual confusion exists in the marketplace, an intent to wilfully infringe ComponentOne's mark on the part of defendants, which the Court notes can only be found on the basis of stretched inferences, and the fact that the parties' sales targets are identical are immaterial. The Court concludes, therefore, examining the totality of the Lapp factors in this case, that ComponentOne has not made a sufficient showing to create a genuine issue of material fact as to a likelihood of confusion between the parties' marks. The Court will therefore grant summary judgment in defendants favor on ComponentOne's trademark infringement, unfair competition and false designation of origin claims.[30]

### B. Pennsylvania Unfair Trade Practices and Consumer Protection Law

In claim IV of its amended complaint, ComponentOne alleges that defendants violated

---

[30]ComponentOne's allegation that defendants have infringed on its trademark because their use of the "ComponentArt" mark creates initial interest confusion also fails. The Court of Appeals for the Third Circuit has stated that district courts are to use the Lapp factors to determine whether initial interest confusion exists. *McNeil Nutritionals*, 511 F.3d at 358. Since the totality of the Lapp factors here shows no likelihood of confusion, ComponentOne's claim fails under both the "source confusion" and "initial interest confusion" theories.

The Court notes that the Court of Appeals for the Third Circuit has commented that when consumers in the relevant market are sophisticated, "some initial confusion will not likely facilitate free riding on the goodwill of another mark, or otherwise harm the user claiming infringement." *Checkpoint Sys.*, 269 F.3d at 296-297. Consumers in the parties' market are extremely diligent in making purchases, often prototyping and considering the quality of support services of a product they are considering purchasing. In such a market, initial interest confusion is highly unlikely. The Court also notes that the evidence ComponentOne has presented of initial interest confusion is self-serving and the number of incidents is *de minimis*. *Id.* at 298-99 (a "handful of e-mails and other anecdotal evidence of mistaken consumer inquiries" is "de minimis" evidence of initial interest confusion). Consequently, ComponentOne's claim that defendants' have misappropriated its goodwill through initial interest confusion must fail.

Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.* Defendants contend that ComponentOne does not have standing to sue under that act. *See* Defs.' Mem. in Supp. Summ. J. 22 n.10. ComponentOne addresses neither defendants' argument nor its fourth claim in its brief in opposition to summary judgment. Consequently, the Court will enter summary judgment in favor of defendants on claim IV of ComponentOne's amended complaint.[31]

### C. Civil Conspiracy and Prayer for Injunctive Relief

The Court will also grant summary judgment to defendants on ComponentOne's prayer for injunctive relief (Count VI) and its civil conspiracy claim (Count X). Each claim required a finding of liability under Count I, II, IV, V, VII, or VIII in order to be successful.

### IV. Conclusion

For the reasons hereinabove discussed, the Court will grant summary judgment on the remaining counts of ComponentOne's amended complaint in favor of the defendants. The Court will accordingly deny ComponentOne's motion to strike defendants' references to survey evidence.

An appropriate Order follows.

McVerry, J.

---

[31]The Court would reach the same result even if ComponentOne would have presented an argument on claim IV. The Pennsylvania Unfair Trade Practices and Consumer Protection Law "unambiguously permits persons who have purchased or leased goods or services to sue." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992). Since ComponentOne does not contend that it has ever purchased or leased ComponentArt's goods or services, it does not have standing to bring a claim under the statute.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

COMPONENTONE, L.L.C.,       )
           **Plaintiff,**      )
       v.                )      02: 05cv1122
                     )
COMPONENTART, INC., STEVE G.    )
ROLUFS, MILJAN BRATICEVIC,     )
DUSAN BRATICEVIC, and CYBERAKT,   )
INC.,                         )
          **Defendants.**     )

## ORDER OF COURT

AND NOW, this 27th day of October, 2008, in accordance with the foregoing Opinion, it

is **ORDERED, ADJUDGED AND DECREED** that the MOTION FOR SUMMARY

JUDGMENT FILED BY DEFENDANTS (Document No. 182) is **GRANTED** in its entirety, and

PLAINTIFF'S MOTION TO STRIKE DEFENDANTS' REFERENCES TO SURVEY

EVIDENCE is **DENIED**.

                                  BY THE COURT:
                                  s/Terrence F. McVerry
                                  United States District Court Judge

cc:     Dennis M. Moskal, Esquire
        Technology & Entrepreneurial Ventures Law Group
        Email: mailroom.dmm@zegarelli.com

        Gregg R. Zegarelli, Esquire
        Technology & Entrepreneurial Ventures Law Group
        Email: mailroom.grz@zegarelli.com

        Jonathan M. Gelchinsky, Esquire
        Finnegan, Henderson, Farabow, Garrett & Dunner
        Email: jon.gelchinsky@finnegan.com

        Lawrence R Robins, Esquire
        Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
        Email: larry.robins@finnegan.com

        William F. Ward, Esquire
        Ward McGough, LLC
        Email: wfw@wardmcgough.com